## MARY DIXON, Widow, v. ROBERT KNOWLES and WILLIAM MOORE.

Orphans' Court. Sussex. March 6, 1820.

*Ridgely's Notebook III, 40.*

[*Robinson* for respondent.]

THE CHANCELLOR. (March 15, 1820.) It appears from the evidence in this cause that the petitioner, Nancy Dixon, eloped from her husband in 1811 or 1812. It probably was in the latter end of the first, or in the beginning of the second of those years. She continued absent until after November, 1814. In that month Mr. Elligood saw her in jail in Kent County. She continued absent from her husband during his lifetime, after her first elopement. Her husband advertised her, that is, gave notice that he would not pay any debts which she might contract. She not only eloped from her husband, but she left her own child, which was then a small infant. The husband died in May, 1813.

James Finsthwait saw this woman in Kent, where she passed under the name of Elizabeth Saunders, and knew her there a year and a half or two years. Mr. Latterfield also knew her by her assumed name in Kent, and for the same period of time.

They speak of the years 1812, 1813, and 1814. Other witnesses speak of her in Kent in 1813. The evidence satisfies me that, before the death of her husband, she eloped from him and continued away from the time of her first elopement until after his death, and that he was never reconciled to her.

As to the adultery during the life of her husband after her elopement, there is no positive evidence of the fact. But the testimony of her loose, disorderly conduct [is] so entirely unbecoming a married woman, or a chaste woman, that the conclusion inevitably follows that she was guilty of adultery, and that she lived in a state of adultery in Kent County during the life of her husband. Her conduct at the house of John Finsthwait, which I presume was the latter part of 1812, was too glaring to admit of any hesitation in believing in her guilt. Then her living with Rachel Lane and afterwards with Jacob Fleming corroborate every presumption which can be made against her antecedently to her attaching herself to Fleming. She was seen in bed with Fleming, when, if her husband were then dead, she did not know, but from the evidence it is to be presumed that she had lain with Fleming before her husband's death. In a state of drunkenness she was also seen on a bed with Clement Simpson in July, 1813, before she knew of her husband's death. From all these circumstances I am satisfied that she eloped from her husband and lived and remained in a state of adultery in his lifetime and was never reconciled to him. (See 2 Bac.Abr., title, "Dower", F; 3 Com.Dig. 542, F2; Co.Litt. 32a; 2 Co.Inst. 435; Dyer 106b; 3 P.Wms. 272, *Sydney v. Sydney*.)

The Act of Assembly (5 Del.Laws 174) was not designed to alter any right which a woman has to dower at common law, nor any of the requisites to the consummation of dower, *viz.,* marriage, seisin, and the death of the husband. Neither was it intended to remove any bar to her dower created by the Statute, Will. II, c. 34, (13 Edw. I, c. 34). But it was intended merely to secure her dower in certain cases of debts, contrary to former Acts of Assembly, and to provide a more expeditious and cheap mode of recovering her dower. Without much consideration of the subject, it seems to me that this Act gives a woman a right to dower exactly as at common law, saving the exceptions therein mentioned of debts; whereas our Intestate Act, in the case of an intestacy, gives the woman dower of all lands, tenements and hereditaments of which a man shall be owner at the time of his death. A very wide difference. However the Act of 1816 (5 Del.Laws 174) removes none of the bars to dower which the Statute Will. II, c. 34, created, and the petition must be dismissed.